IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PATRICK W. REED, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CV3096 |
| | ) | |
| v. | ) | |
| | ) | |
| CHIEF ENGINEER ROBERT L. ANTWERP, Lieutenant General, Chief Engineer of the United States Army Corps of Engineers, DISTRICT ENGINEER DAVID PRESS, Colonel, Omaha District Commander and District Engineer of the Army Corps of Engineers, KEN SALAZAR, Secretary of the Interior, STEPHEN GUERTIN, Mountain-Prairie Regional Director of the Unites States Fish and Wildlife Service, NEBRASKA PUBLIC POWER DISTRICT, STATE OF NEBRASKA GAME AND PARKS COMMISSION, and REX AMACK, in his official capacity as director of the Nebraska Game and Parks Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the plaintiff's motion for a preliminary injunction, Filing No. 3.[1] A hearing and argument on the motion was held on July 23, 2009. At the hearing, the court took judicial notice of affidavits and supporting documents submitted in connection with the motion. Filing Nos. 4, 32, 34, 35, 41, and 49, Indices of Evidence

---

[1] Also pending are plaintiff's recently filed motions for a temporary restraining order and for an expedited hearing on the motion, Filing Nos. 62 and 64. Those motions were filed in response to NPPD's letter indicating that the scheduled outage and construction and installation of power poles and lines has been moved from September 14, 2009, to September 2, 2009. The court has reviewed the evidence submitted in connection with the motions and concludes that it does not affect the court's resolution of the present motion. The plaintiff's motions for a temporary restraining order and a hearing are rendered moot by this Memorandum and Order.

("Evid."). This is an action to enforce rights under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq*. ("NEPA"); the Pittman-Robinson Wildlife Restoration Act, and Dingell-Johnson Sport Fish Restoration Act, 16 U.S.C. § 669 *et seq.*, 16 U.S.C. § 777 *et seq.*, 50 C.F.R. § 80.1 *et seq.* ("the Restoration Acts"); and the Civil Rights Act, 42 U.S.C. § 1983. The plaintiff bases jurisdiction on 28 U.S.C. § 1331 and 1361.

In his complaint, plaintiff seeks a declaratory judgment, mandatory injunction, and writ of mandamus ordering that an environmental impact statement be prepared in connection with the construction and permanent placement of a 345,000 volt ("345 kV") transmission line through and over the Twin Lakes Wildlife Management Area ("Twin Lakes") in Seward County, Nebraska. He contends that NPPD does not possess valid easements for parts of the project and argues that the Federal defendants have violated the NEPA in failing to consider the need for an environmental impact statement. He argues that he and others will suffer irreparable harm if the defendants are not enjoined from proceeding with the project. Defendants Robert L. Antwerp and David Press of the Army Corps of Engineers, Ken Salazar, the Secretary of the Interior and Stephen Guertin of the Unites States Fish and Wildlife Service (hereinafter, "the Federal defendants"), the State of Nebraska Game and Parks Commission and its director, Rex Amack (hereinafter, collectively "the State"), and the Nebraska Public Power District ("NPPD") argue that the plaintiff does not have standing and that he has not shown that he is likely to succeed on the merits of his claim or that he will suffer irreparable harm if the project proceeds.

## I. FACTS

In August 2006, the Nebraska Public Power District approved the construction of the Electric Transmission Reliability Project for East-Central Nebraska ("ETR Project"). Filing

No. 34, Index of Evid., Ex. a, Affidavit of Michael E. Wagner ("Wagner Aff.") at 2.  The ETR Project consists of approximately 80 miles of new 345 kV transmission line extending from Columbus to Lincoln, Nebraska.  *Id.*  The combined 115 kV and 345 kV transmission lines will improve the reliability of NPPD's entire transmission system in Nebraska.  *Id.* at 8.  The project will be completed in seven segments.  *Id.* at 3. At issue in this action is the construction of 1.5 miles of transmission lines over and across segment 6, which includes the Twin Lakes Wildlife Management Area and is presently scheduled for completion in December 2009.  *Id.*

Plaintiff owns a residence adjacent to Twin Lakes Wildlife Management Area and he uses the area for recreational purposes, including camping, horseback riding, fishing, hunting, trapping, target shooting, dog training, and bird watching.  Filing No. 4, Index of Evid., Ex. 1, Affidavit of Patrick W. Reed ("Reed Aff.") at 1-2, 5-6.  He has attended numerous public meetings held by NPPD discussing the details of the proposed construction of the 345kV line and has obtained numerous documents relevant to the project.  *Id*. at 2-3.  He has learned that construction of the 345 kV transmission line across NPPD's preferred route will require excavation twenty-five feet deep and large enough for the placement of a seven-foot diameter base so as to accommodate the 100 to 165 poles that will be constructed on Twin Lakes property to support the line.  *Id*. at 3-4.  Plaintiff has shown that a threatened plant species, the Western Prairie Fringed Orchid, was documented to inhabit the Twin Lakes Wildlife Management Area, but drought has reduced the observable population of the plant in recent years.  *Id*., Reed Aff. at 4, Ex. B, Tim Janssen Survey at 1-2.  A suitable habitat for the plant is located in the southwest corner of the wildlife management area.  *Id*., Ex. B at 2.

In response to concerns about migratory waterfowl, the Nebraska Game and Parks Commission requested that NPPD consider installation of bird diverters or marker balls to minimize avian line strikes. Filing No. 32, Index of Evid., Ex. 2, Affidavit of Carey Grell ("Grell Aff.") at 3. NPPD agreed to do so. *Id.*, Grell Aff., Attachments H, K, & L, Correspondence. Also, NPPD agreed not to place any structures within the potential habitat area of the Western Prairie Fringed Orchid and to minimize construction disturbance within the habitat area. *Id.*, Grell Aff., Attachments N, O, & P, e-mail correspondence.

The Twin Lakes Wildlife Management Area was originally part of the U.S. Army Corps of Engineers' Salt Creek Lakes and Tributaries Project Flood-Control Area. Filing No. 35, Index of Evid., Ex. 1, Declaration of Robert C. Incontro ("Incontro Decl.") at 2-3. In 1958, Congress authorized the acquisition of land as part of the project to establish Dam Site 13. *Id.* at 2. The Nebraska Game and Parks Commission later requested that the Corps acquire additional land at or near the site on behalf of the State for recreational and other purposes. *Id.* The Corps of Engineers and NGPC later entered into an agreement whereby the Corps would acquire the land and the NGPC would assume all costs relating to use of the lake for recreational purposes. *Id.* at 2.

At the time the wildlife management area was established in 1965, NPPD already had an existing 115,000 volt ("115 kV") transmission line across Twin Lakes which had been constructed on easements that its predecessor had obtained in 1937. Filing No. 4, Index of Evid., Ex. 2, Affidavit of Kent R. Radke ("Radke Aff.") at 3. During the creation of Dam Site 13, the Corps of Engineers contracted with NPPD's predecessor for relocation of a portion of the 115kV transmission lines to accommodate construction. Filing No. 35,

Ex. 1, Incontro Decl. at 2-3.  The plaintiff has presented expert testimony purporting to show that the easements granted in 1937 are limited to a width of 38 feet and the easements granted in 1968 provide for a 100-foot right-of-way.  Filing No. 4, Index of Evid., Ex. 2, Radke Aff. at 4-5.  The defendants, on the other hand, have presented evidence that the easement is 100 feet wide.  Filing No. 34, Index of Evid., Wagner Aff. at 6-7, Exs. C, D, E, F, & G.  The full 100-foot wide easement has been used by NPPD for space required for blow out of the line during wind conditions and for maintenance.  Id. at 8.

The existing 115 kV transmission line consists of 14 existing structures: ten wooden two-pole, H-frame structures, with horizontally extending cross arms, three guyed three-pole structures and one lattice tower.  Id., Wagner Aff. at 5-6, Ex. A1 - A2.  For the ERT project, the present two-pole structures will be removed and replaced with 13 single-pole steel structures that will use no guy wires.  Id., Ex. B.  The new structures will carry both the existing 115kV line and the new 345kV line.  Id., Wagner Aff. at 5-8.  The foundations for 9 of the 13 structures have already been installed and the remaining four foundations will be constructed when NPPD takes the existing 115 kV line out of service, so the new line can be installed.  Id. at 8.  An outage is planned for the existing 115 kV line in September 2009.  Id.

Jolene M. Hulsing, a Natural Resources Specialist for the U.S. Army Corps of Engineers, whose duties include reviewing proposed and existing projects for environmental stewardship, coordinated the Corps' NEPA review of NPPD's upgrade to 345 kV transmission lines.  Filing No. 35, Index of Evid., Ex. 2, Declaration of Jolene M. Hulsing ("Hulsing Decl.") at 2.  After conferring with the Corps of Engineers' Real Estate Division and Operation Division Office, she determined that the project was a routine real

estate action and not a major federal action that required either an environmental impact statement or an environmental assessment under NEPA because the upgrade would be contained fully within NPPD's easements. *Id*. at 2. As part of her review, she evaluated maps and environmental reports from other agencies, reviewed comments from environmental specialists for the State of Nebraska and the U.S. Department of the Interior and made two site visits. *Id*. at 2-3. She completed an internal NEPA Checklist for Record of Environmental Considerations. *Id*. at 3, Ex. B, Checklist. She concluded that the project, as it related to Twin Lakes, was categorically excluded from NEPA documentation under Exclusions 9(a) and 9(h) of Engineering Regulation 200-2-2, 33 C.F.R. § 230.9 (March 4, 1988).[2] *Id.* at 3-4, Ex. A, Engineering Regulation 200-2-2 (March 4, 1988); *see* 33 C.F.R. § 230.9 (2009). A Corps of Engineers' Natural Resources Specialist, Matthew

---

[2]Those provisions were recodified as 33 C.F.R. § 230.9(b) and (i). They provide that the following actions "do not have significant effects on the quality of the human environment and are categorically excluded" from documentation under the NEPA:

> Activities at completed Corps projects which carry out the authorized project purposes. Examples include routine operation and maintenance actions, general administration, equipment purchases, custodial actions, erosion control, painting, repair, rehabilitation, replacement of existing structures and facilities such as buildings, roads, levees, groins and utilities, and installation of new buildings utilities, or roadways in developed areas.

33 C.F.R. § 230.9(b) (formerly Exclusion 9(a)).

> (i) Real estate grants for rights-of-way which involve only minor disturbances to earth, air, or water:
>
>> (1) Minor access roads, streets and boat ramps.
>> (2) Minor utility distribution and collection lines, including irrigation.
>> (3) Removal of sand, gravel, rock, and other material from existing borrow areas.
>> (4) Oil and gas seismic and gravity meter survey for exploration purposes.

33 C.F.R. § 230.9(i) (formerly Exclusion 9(h)).

Wray, evaluated the project for compliance with the Clean Water Act and determined that the proposed project did not require any permitting action by the Corps. Filing No. 35, Ex. 3, Declaration of Matthew T. Wray at 3. The Chief of the Division of Wildlife and Sport Restoration of the Fish and Wildlife Service of the Department of the Interior ("FWS") determined that the FWS does not own or manage the Twin Lakes Wildlife Management Area and did not need to approve the project, to issue any permit, or to comply with NEPA for the ETR project. *Id.*, Ex. 5, Declaration of David MacGillivary at 2. Also, there were no federal funds used for the construction, maintenance or operation of any electrical transmission lines at Twin Lakes. *Id.*, Ex. 4, Declaration of Steven R. Earl at 2.

Marilyn Tabor determined that the Nebraska Game and Parks Commission was not required to perform an analysis of the impact of the upgrade to the power lines on the Twin Lakes Wildlife Management Area since it crossed the wildlife management area within an existing easement. Filing No. 32, Index of Evid., Ex. 1, Affidavit of Marilyn Tabor at 1-2. Carey Grell, an NGPC environmental analyst, also reviewed project documentation and determined there was no federal nexus to the project to trigger NEPA actions and no state nexus to trigger consultation requirements under the Nebraska Nongame and Endangered Species Act. Filing No. 32, Index of Evid., Ex. 2, Grell Aff. at 2. He also determined that use of the existing easement would have less impact on the area than construction of a new line through other parts of the area and that the upgrade of the current line with the addition of new lines along the existing alignment would eliminate the need for a new and separate line that could have additional impacts on migratory birds. *Id.* He concluded that the removal of the existing structures, including guy wires, would lessen the footprint of the line within the wildlife management area. *Id.* at 4.

NGPC expressed concerns to NPPD about tree removal, re-seeding, soil dispersal and construction timing restrictions, and NPPD agreed to the NGPC's recommendations, including the recommendation that it conduct tree-clearing activities outside the primary nesting season for migratory birds. *Id.* at 4-5. NGPC ultimately concluded that the project, as implemented, would be no impact on the threatened Western Prairie Fringed Orchid. *Id.* at 5, Attachment J, Correspondence. It also found that the removal of existing structures and guy wires would provide for greater safety in the wildlife management area. *Id.*, Grell Aff. at 4.

NPPD has shown that its ratepayers will sustain damage if construction of the 1.5 miles of transmission line in Twin Lakes is enjoined, because the 345 kV line from Lincoln to Columbus cannot be used without lines across Twin Lakes. Wagner Aff. at 9-10. The entire line must be constructed and interconnected into the grid in order to reliably move bulk power to major load centers in Nebraska. *Id.* at 10. Also, it has shown that, without the 345 kV line, NPPD will not meet the mandatory voltage criteria requirements established by North American Electric Reliability Council if there is peak demand for electricity. *Id.* Failure to meet the mandatory reliability standards would result in unreliable service to our customers and would subject NPPD to a fine of up to $1 million a day. *Id.* Also, NPPD has made a $150 million investment in the new line and would incur additional costs if the line cannot be completed. *Id.* at 10-11.

## II. DISCUSSION

### A. Law

Article III of the U.S. Constitution limits judicial power to "cases or controversies." Except when necessary to prevent actual or imminently threatened injury to persons

caused by private or official violation of law, courts have no charter to review and revise legislative and judicial action. *Summers v. Earth Island Inst.,* — U.S. —, —, 129 S. Ct. 1142, 1148 (Mar. 3, 2009). The doctrine of standing reflects this fundamental limitation. *Id.* at 1149. Federal courts are required to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction. *Id.* To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury. *Id.*

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.,* — U.S. —,—, 129 S. Ct. 365, 375 (2008). A plaintiff seeking preliminary relief must demonstrate that irreparable injury is *likely* in the absence of an injunction. *Id.*, — U.S. at —, 129 S. Ct. at 375 (emphasis in original). Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with the Supreme Court's characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Id.* at — U.S. at —, 129 S. Ct. at 375-76. A preliminary injunction is an extraordinary remedy never awarded as of right. *Id.*, — U.S. at —, 129 S. Ct. at 376. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Id.* "In exercising

their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Id.* at 376-77.

Judicial review of a federal agency action is governed by Administrative Procedure Act (APA). See 5 U.S.C. § 551 *et seq.*; National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq*. The APA authorizes suit by a person suffering a legal wrong because of an agency action. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004). A reviewable agency action can include a failure to act. *Id.* at 63-64 (noting that a failure to act is not the same as a denial). However, the only action that can be compelled under the APA is an action that is legally required. *Id.* at 63; 5 U.S.C. § 706(1). "Thus, a claim under [the APA] can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take. *Id*. at 64 (emphasis in original).

The NEPA requires federal agencies to evaluate the impact of their actions on the natural environment. *See* 42 U.S.C. § 4332. Specifically, it requires all federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . the environmental impact of the proposed action[.]" 42 U.S.C. § 4332(2)(c). However, "when the Government conducts an activity, 'NEPA itself does not mandate particular results.'" *Winter,* — U.S. at —, 129 S. Ct. at 376 (*quoting Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). The NEPA imposes only procedural requirements to "ensur[e] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Winter,* — U.S. at —, 129 S. Ct. at 376 (noting that the

10

case was not one that involved "conducting a new type of activity with completely unknown effects on the environment"). The NEPA focuses on activities of the federal government and does not require federal review of the environmental consequences of private decisions or actions, or those of state or local governments. *Goos v. I.C.C.*, 911 F.2d 1283, 1294 (8th Cir. 1990). An agency has "legal control" over a state project, and must comply with NEPA, when some federal action is a legal condition precedent to accomplishment of an entire nonfederal project. *Id*.; 40 C.F.R. §§ 1508.18 ("Major federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."); 1508(b)(4) (approval by permit is a Federal action).

Under the NEPA, the Council on Environmental Quality ("CEQ") has promulgated regulations that require all agencies to comply with certain procedures before taking actions that significantly affect the quality of the human environment. *See* 42 U.S.C. § 4342; 40 C.F.R. Part 1500. Except in limited circumstances, the regulations require agencies to prepare an "environmental assessment" ("EA") and/or an "environmental impact statement" ("EIS") before proposing legislation or undertaking a "major Federal action" that affects the environment.[3] 40 C.F.R. §§ 1501.3, 1501.4. The regulations also require agencies to adopt implementing procedures to determine which actions normally do not have a significant impact on the environment and need no environmental impact study or report. 40 C.F.R. § 1501.4 (a)(2); 1508.4; *Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir. 1998). A "categorical exclusion" relates to actions that have been found not to have a significant effect on the human environment under these implementing procedures.

---

[3] An EIS is "a detailed written statement as required by" NEPA. 40 C.F.R. § 1508.11. An EA is "a concise public document" that an agency prepares when deciding whether it needs to prepare a more extensive EIS. 40 C.F.R. § 1508.9.

*Rhodes,* 153 F.3d at 788; *Heartwood, Inc. v. United States Forest Service,* 230 F.3d 947, 949-50 (7th Cir. 2000).

The Corps of Engineers has designated several actions as categorical exclusions. See 33 C.F.R. pt. 325, Appendix B, § 6. Among those actions are routine operation and maintenance activities at completed Corps of Engineers' projects which carry out the authorized project purposes, for example, erosion control, painting, repair, rehabilitation, replacement of existing structures and facilities such as buildings, roads, levees, groins and utilities, and installation of new buildings, utilities, or roadways in developed areas. 33 C.F.R. § 230.9(b) (formerly Exclusion 9(a)). Also categorically excluded are "[r]eal estate grants for rights-of-way which involve only minor disturbances to earth, air, or water," for access roads, streets, boat ramps, and minor utility distribution and collection lines. 33 C.F.R. § 230.9(i) (formerly Exclusion 9(h)). In determining that a categorical exclusion applies, the agency must simply explain its decision in a reasoned manner. *Alaska Ctr. for the Env't v. United States Forest Serv.*, 189 F.3d 851, 859 (9th Cir.1999) (noting that "[w]hen an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision."). To comply with NEPA, "'[t]he agency must supply a convincing statement of reasons why potential effects are insignificant.'" *Id.* (*quoting Steamboaters v. Federal Energy Regulatory Comm'n,* 759 F.2d 1382, 1393 (9th Cir. 1985)).

An agency's substantive decision to proceed with a project after the agency has prepared an adequate EIS considering the environmental effects is reviewed under the deferential arbitrary and capricious standard; however, the threshold determination of an agency's determination not to prepare an impact statement should be measured by its reasonableness in the circumstances. *Minnesota Pub. Interest Res. Group v. Butz,* 498

F.2d 1314, 1319-20 (8th Cir. 1974); *see also Winnebago Tribe of Nebraska v. Ray*, 621 F.2d 269, 271 (8th Cir. 1980) (involving the propriety of a decision by the Army Corps of Engineers not to prepare an EIS on the environmental impact of a power line running across the Missouri River). An agency's determination not to prepare an EIS "will be upheld if the agency can support the reasonableness of its decision." *Olmsted Citizens for a Better Cmty. v. United States,* 793 F.2d 201 (8th Cir.1986). When an agency's factual determination is made under the assumption that NEPA applies, the standard is arbitrary and capricious, but when the threshold issue is NEPA applicability in the first instance, the reasonableness standard applies. *Goos v. I.C.C.*, 911 F.2d 1283, 1292 (8th Cir. 1990) (distinguishing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989), on the basis that the threshold determination does not involve a factual dispute that requires substantial agency expertise to resolve). Accordingly, the threshold issue of whether the NEPA is applicable in the first instance, including whether the project is a "major federal action" is reviewed for reasonableness. *Id.* at 1292; *see also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004).

The Congressional command that agencies cooperate in attaining the goals of NEPA "to the fullest extent possible" requires the courts to look at the good faith efforts of the agency to comply. *Id.* The NEPA requires that agencies take a "hard look" at environmental consequences of their actions. *Marsh v. Oregon Natural Res. Council*, 490 U.S. at 374. To upset an agency determination not to prepare an impact statement, it must be shown that the agency's determination was not reasonable under the circumstances, which will require a showing that the project could significantly affect the quality of the human environment. *Winnebago Tribe,* 621 F.2d at 271. In order to show that a project could significantly affect the human environment, the plaintiff must raise a substantial

13

environmental issue concerning the proposed project, and then the burden shifts to the defendant to support the reasonableness of the negative determination. *Id.*

### B. Analysis

Assuming, without deciding, that the plaintiff has alleged an injury sufficient to confer standing, the court finds that plaintiff's motion for preliminary injunctive relief should be denied. First, the court finds the plaintiff has not shown a probability of success on the merits of his claim. At issue is the defendants' failure to conduct an environmental impact study or environmental assessment in connection with the NPPD project. The evidence shows that the Corps of Engineers justified its decision not to conduct an environmental impact study on the lack of a federal action and on categorical exclusions. First, it is questionable whether the construction project is a "federal action," so as to trigger NEPA requirements. It appears that the federal defendants are only incidentally involved in the project and can exert little control or influence over the property "carved out" of the wildlife area by virtue of the preexisting easements. Second, the plaintiff has not shown that the Corps of Engineers' determination that the project was the type of action that was categorically excluded from the EIS or EA requirement was unreasonable. At least part of the project constituted repair or replacement of an existing structure. It would have been reasonable to conclude that the addition of a second power line to the replaced initial line would cause little or additional incremental environmental impact or would cause less impact than a separate second line.

The plaintiff has not shown that the project could significantly affect the environment, so as to create a statutory obligation to conduct an environmental impact study or environmental assessment. The plaintiff has shown only the replacement and addition of the power lines presents the possibility of damage to a threatened plant

14

species. The evidence also shows that defendants have addressed and ameliorated those concerns, as well as concerns over potential harm to migratory birds. The federal defendants appear to have followed their regulations in making the determination, and the evidence shows at least a good-faith effort to consider environmental concerns. Importantly, NPPD's easement predated the creation of the wildlife area. Power poles have been present at the site since its inception. There has been no showing that the new power poles would be significantly more injurious to the environment than the poles already in place.

Plaintiff has also failed to show that he will suffer irreparable harm in the absence of preliminary relief. Although he has shown that he enjoys recreational and sporting activities the Twin Lakes area, there is no evidence of the detrimental effect the new power poles will have on those activities. Although any construction project necessarily involves some element of disruption to any environment, the plaintiff has not shown that the effects of such disruption are anything but temporary. Moreover, most of the disruption has already occurred and the project is well underway. Notwithstanding the plaintiff's subjective opinion that the change in poles will create an aesthetic blot on the landscape, it is at least arguable that the new power line will be no less aesthetically pleasing that the old line.

Also, the balance of equities tips in favor of the defendants. The evidence shows that defendant NPPD has made a considerable investment in the project. It will be significantly harmed should an injunction issue. The defendants have demonstrated good faith in responding to the environmental concerns raised by the NGPC. Moreover, the defendants have shown that environmental concerns have been remedied or at least ameliorated by the NPPD's agreements not to interfere with the Western Prairie Fringed

Orchid habitat and to install orange balls to discourage aviary strikes. Further, the evidence shows that the defendants conducted several public hearings and made efforts to involve the community in its decision-making process. The court finds that equitable considerations weigh in favor of defendants.

Finally, the evidence shows that NPPD is a public utility and the public's interest lies in completion of the project and the provision of reliable electrical service. Plaintiff has not produced evidence that an environmental impact study would produce a benefit that could outweigh the demonstrated benefits of completion of the project. Under the circumstances, the court finds that the motion for a preliminary injunction should be denied.

IT IS ORDERED:

1. The plaintiff's motion for a preliminary injunction (Filing No. 3) is denied.

2. The plaintiff's motions for a temporary restraining order and for an expedited hearing on the motion, Filing Nos. 62 and 64, are denied.

DATED this 28th day of August, 2009.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.